Mary B. Rogers
**PITNEY HARDIN LLP**
(MAIL TO) P.O. BOX 1945, MORRISTOWN, N.J. 07962-1945
(DELIVERY TO) 200 CAMPUS DRIVE, FLORHAM PARK, N.J. 07932-0950
(973) 966-6300

**ATTORNEYS FOR** Defendant
Verizon New Jersey Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DAVID A. EHEHALT, | : | HONORABLE |
| | | Civil Action No. |
| Plaintiff, | : | |
| v. | : | |
| VERIZON COMMUNICATIONS OF NEW JERSEY, any ABC Corporations, any JOHN & JANE Does, 1-100 all names being fictitious, | : | **NOTICE OF REMOVAL** |
| | : | |
| | : | |
| Defendants. | | |

Verizon New Jersey Inc. ("Verizon") (improperly pleaded as "Verizon Communications of New Jersey"), the defendant in the above-captioned matter, hereby files the within Notice of Removal and states in support of the Notice of Removal that:

1.   This action was commenced in the Superior Court of New Jersey, Law Division, Essex County, by the filing of a

1338533A02090205

Complaint on August 2, 2005, and is entitled *David A. Ehehalt v. Verizon Communications of New Jersey, any ABC Corporations any John & Jane Does, 1-100 all names being fictitious.* A true copy of the Complaint is attached hereto as Exhibit A.

2. Verizon first received notice of the Complaint by service or otherwise on or after August 9, 2005. The Complaint was the first pleading served upon or otherwise provided to or received by defendant setting forth the claims for relief upon which this action is based.

3. This Notice of Removal is timely under 28 U.S.C. §1446(b), it being filed within thirty days after service of the initial pleading setting forth the claims for relief upon which this action is based. The time period of thirty days from August 9, 2005 expires on September 8, 2005.

4. The Complaint represents all the process, pleadings, or orders served upon Verizon. No hearings or other proceedings have taken place in this action to Verizon's knowledge.

5. During plaintiff's employment with Verizon, the terms and conditions of his employment were set forth in a collective bargaining agreement (the "CBA") between Verizon and

the International Brotherhood of Electrical Workers, Local 827, AFL-CIO ("IBEW").  The CBA contained a grievance and arbitration provision. The relevant provisions of the CBA are attached hereto as Exhibit B.

6.  Additionally, in 2003, Verizon and the IBEW entered into a Settlement Agreement. That Settlement Agreement is attached hereto as Exhibit C.  That Agreement rehired or offered reinstatement to a number of employees who had been laid off from Verizon.  Plaintiff was one of the employees rehired.  The Agreement governs the terms of the "make whole remedy" for those laid off employees, of which plaintiff was one.

7.  Further, the Settlement Agreement specifically provided that "nothing shall preclude the Union [IBEW] or any employee from contesting any aspect of the Companies' reinstatement and/or administration of this settlement agreement as they relate to any employee's specific circumstances.  The *exclusive* forum for resolution of any such claim(s) shall be contractual grievance and arbitration procedures."

8.  Following plaintiff's rehire in July of 2003, plaintiff was arrested and charged with receiving and fencing stolen Verizon property. During the course of the criminal investigation, Verizon learned that plaintiff had failed to

3

disclose a prior criminal conviction on his employment application. As a result, on August 4, 2003, Verizon discharged plaintiff from its employ.

9.   Plaintiff alleges that he was wrongfully discharged in violation of an "employment contract."   Plaintiff further alleges that he has "consequential damages" relating to his lay-off and discharge.

10. Since those rights were created by the CBA, a collectively negotiated agreement, and/or the Settlement Agreement, and are substantially dependent upon interpretation of those agreements, Plaintiff's claims are therefore preempted completely by §301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. §301.

11. Plaintiff's further claim that he was refused correct funding of his 401K plan constitutes a violation of ERISA, 29 U.S.C. §1140.  Consequently, this action may be removed to this Court pursuant to 28 U.S.C. §1441(b), in that it is a civil action arising under the laws of the United States.

12. Defendant will give written notice of the filing of this Notice of Removal to all adverse parties, as required by 28 U.S.C. § 1446(d).

13. Defendant will file a true and correct copy of this Notice of Removal with the Clerk of the Superior Court of New Jersey, Essex County, as required by 28 U.S.C. § 1446(d).

WHEREFORE, defendant Verizon New Jersey Inc. requests that the foregoing action be removed from the Superior Court of New Jersey, Law Division, Essex County, to the United States District Court for the District of New Jersey.

PITNEY HARDIN LLP
Attorneys for Defendant
Verizon New Jersey Inc.

By:   *Mary B. Rogers*
           MARY B. ROGERS
       A Member of the Firm

DATED: September 2 , 2005.

1338533A02090205

5

# EXHIBIT A

Case 2:05-cv-04415-JLL-CCC Document 1 Filed 09/07/05 Page 7 of 26 PageID:



# DAVID A. EHEHALT

**POST OFFICE BOX 468**
**MOUNT FREEDOM, NEW JERSEY 07970-0468**

(973) 989-2474
(973) 361-5554

RECEIVED
AUG 17 2005
LABOR GROUP

RECEIVED
AUG - 9 2005
VERIZON NEW JERSEY INC.
LEGAL DEPARTMENT

David A. Ehehalt
Plaintiff

VS

VERIZON COMMUNICATIONS
Of New Jersey, any ABC Corporations
any JOHN & JANE DOES, 1-100 all names
Being fictitious

SUPERIOR COURT of New Jersey

DOCKET # 006216-05

CIVIL DIVISION

COMPLAINT &
JURY DEMAND

I the Plaintiff David A. Ehehalt, Residing at 74 Lawrence Road, Randolph, New Jersey 07869 by way of a complaint against the above listed defendants says:

## FIRST COUNT

1. At all times relevant the above named corporate defendants listed are authorized to do business in the state of New Jersey and act through its John & Jane Does its employees / Managers

2. The defendant (s) listed above are in the business of providing Telecommunications service Via: copper, fiber and by other means to their customers in a franchised area in the state of New Jersey as determined by the state of New Jersey Board of Public Utilities, (B.P.U.)

3. The plaintiff was employed by the defendants and wrongfully discharged (fired) on August 4th, 2003 in violation of an employment contract and by duress by 3rd parties & other violations of law without good cause.

## SECOND COUNT

1. The plaintiff repeats Lines # 1 & 2 of the first count

2. The plaintiff was part of a lay-off on approximately Dec. 21st 2002 and later re-hired back on approximately July 29th 2003 then fired as per the above date and has caused Consequential Damages as it relates to the lay-off & the discharge

## THIRD COUNT

1   The plaintiff repeats lines # 1 & 2 of the first count

2   The defendant corporation agreed to Fund the 401K Savings & Security
    program as part of the re-hire and have refused to correct the funding of this
    item and the plaintiff has made many request Via: Phone calls & Certified &
    Regular Mail to the defendants "Make Whole Center"

The above plaintiff seeks damages, interest, for compensation and punitive
damages for the above, plaintiff also request as a Pro Se litigant the right to
amend the above complaint as needed in the interest of all parties.

JURY DEMAND

Plaintiff herby demands a trial by jury

CERTIFICATION

The plaintiff ( David A. Ehehalt ) hereby certify the following
    1   There are no other actions between the plaintiff and the defendant at
        this time.
    2   The plaintiff will effect service on the defendant corp. & its senior
        executive staff at their known address in New Jersey Via in person &
        Regular. & Certified Mail at the time when a Docket # is assigned to
        the above case.

David A. Ehehalt,  Plaintiff / Pro Se

# EXHIBIT B

Is Safety All That Important?
You Bet Your Life It Is!



AGREEMENT

BETWEEN

LOCAL 827
INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS, AFL-CIO

AND

VERIZON NEW JERSEY INC.
AND
VERIZON SERVICES CORP.

ORGANIZATION OF VICE PRESIDENT
AND
COMPTROLLER AND GENERAL DEPARTMENTS

AND

PLANT AND ENGINEERING DEPARTMENTS

EFFECTIVE AUGUST 3, 2003

requirements of the available jobs, provided, however, that if the emergency work lasts for more than one (1) week, employees who have been laid off will be given an opportunity to become employed on the job created by the emergency.

9. The term "area" as used in paragraphs 2 and 8 above shall mean and include the following six (6) Company operating areas: Central Area, Essex Area, Hudson Area, Northern Area, Raritan Area and Southern Area, as shown in Exhibit V.

## ARTICLE VIII

### SEPARATIONS FROM THE SERVICE — OTHER THAN LAYOFFS

Section 1. The Company agrees to review and discuss in any desired detail, when requested by the Union, a case of any Plant Department or Engineering Department nonsupervisory employee who has been or is about to be demoted, separated from the service of the Company or suspended. The Company also agrees to orally advise the local Union Steward or alternate of any separation or suspension not later than the third workday following the employee's separation or suspension, but failure to give such notice will not invalidate any action taken. If desired by the Union, the procedure outlined in Article XI, Grievance Procedure, shall be applicable to this Section.

Section 2. In the event that any regular employee with more than nine (9) months of net credited service claims to have been discharged, demoted or suspended without just cause, such claim shall first be reviewed in accordance with the procedure prescribed in Article XI, Grievance Procedure.

In the event it is agreed that the employee is to be reinstated, the terms of such reinstatement shall also be settled by agreement.

In the event that the parties are unable to agree on the question as to whether the employee involved was discharged, demoted or suspended without just cause, the Union may, upon written request served on the Company within thirty (30) days after the provisions

[130]

of Article XI, Grievance Procedure, have been exhausted, require that the question at issue be submitted to arbitration pursuant to provisions of Article XII, Arbitration.

If the arbitration award finds that the discharge, demotion or suspension was made without just cause, the employee shall be reinstated on the following basis:

(a) In case of discharge or suspension the employee shall receive his regular rate of pay for time lost or such portion of his regular pay as is specified by the arbitration award, less any amount other than wages received from the Company at time of discharge or suspension and any amounts paid to or receivable by employee as wages in other employment and as unemployment benefits or disability benefits under any present or future provision of law for the period since the date of such discharge or suspension.

(b) In the case of demotion, the employee shall be compensated for all loss of wages due to difference in basic weekly rate of pay.

Section 3. In the case of separations from the service of the Company, other than layoffs which are covered separately in Article VII, Force Adjustments and Termination Allowances, of this Agreement, the Company agrees that the following conditions of notice and other treatment shall apply:

(a) Where the separation does not involve an allegation of misconduct, the employee shall be given two (2) weeks' prior notice or two (2) weeks' pay in lieu thereof.

(b) Separations involving allegations of misconduct often require that the employee cease working immediately. Separations of this nature may be presented by the Union as grievances under Section 1 of this Article either before or after the actual separation has become effective, but must be presented within two (2) weeks of the time the employee ceases work. If, following the review of such a separation in accordance with the provisions of Section 1 of this Article, it is agreed by the Union and the Company that the employee was guilty of misconduct, but the Company agrees to give him another chance in its employ,

[131]

## ARTICLE XI

## GRIEVANCE PROCEDURE

Section 1. Grievances of individual members or groups of members of the Union, and grievances of members who have been separated from the employ of the Union, may be presented initially for adjustment to the Union, either orally or in writing, within thirty (30) days after the grievance arose, to the immediate supervisor of the aggrieved member or members, or to any other supervisor having authority over the matter, up to and including the Director or equivalent force head. The grievance shall be settled as expeditiously as possible; if it is not adjusted satisfactorily at the Director level within fourteen (14) days, the case shall be considered closed unless the Union takes an appeal as provided in Section 2 below.

Section 2. If the grievance is not satisfactorily adjusted under the provisions of Section 1 above, the Union may appeal the grievance either orally or in writing, setting forth the Union's position with respect to such grievance, within fourteen (14) days after discussions have been concluded under Section 1 above to the Director level supervisor, or equivalent force head, of the employee or employees concerned. Conferences shall be held promptly between the Union representatives and Company representatives at this level in an effort to reach a satisfactory adjustment of the grievance. The grievance shall be settled as expeditiously as possible; if the grievance is not adjusted at this level within fourteen (14) days, the case shall be considered closed unless the Union takes an appeal as provided in Section 3 below.

Section 3. If the grievance is not satisfactorily adjusted under the provisions of Sections 1 and 2 above, the Union may appeal the grievance by written notice, which notice shall set forth the Union's position with respect to such grievance, to the Director-Labor Relations designated by the Company within fourteen (14) days after discussions have been concluded under Section 2 above. Conferences shall be held promptly between the Union and the Company representatives, or such other representatives as either party may select, in a further effort to reach a satisfactory adjustment of the

[134]

grievance. Fourteen (14) days shall be allowed for adjustment of the grievance at this level. If a satisfactory adjustment is not reached, the Company, within fourteen (14) days after discussions have been concluded at this level, shall submit to the Union in writing a final statement of its position. The case shall then be considered closed unless the grievance is arbitrable and arbitration proceedings are initiated under the provisions of Article XII, Arbitration, within thirty (30) days after the period allowed for adjustment at this level.

Section 4. If any grievance involving a controversy over the true intent and meaning or the application, in any particular instance, of any provision of this Agreement, is not satisfactorily adjusted under the provisions of Sections 1 and 2 above, the Union's written notice to the Director-Labor Relations appealing the grievance specified in Section 3 above shall identify, by Article and Section, the particular provision(s) of the Agreement at issue.

Section 5. When a matter involving a member or members of the Union has been referred to the management for adjustment, by a representative of the Union, the management will not discuss any phase of the question with the member or members, nor will it impart to such member or members any information pertaining to the matter, without first affording the representative of the Union an opportunity to be present, at a time and place mutually agreeable to the Union and the Company. In a case of this nature, the Company will advise the Union of all of its decisions relative to the questions before notifying the member or members concerned.

Section 6. It is expressly provided, however, that nothing in this Article shall in any manner affect the right of any individual employee or group of employees to present grievances directly to the Company and to have them adjusted, provided such adjustment is not inconsistent with this Agreement or with any applicable law. Any such grievance shall be submitted in the manner provided in Section 1 above, and may be appealed by the employee or employees concerned in the manner provided for in Sections 2 and 3 above. However, if any grievance presented by an employee or group of employees involves a question of interpretation or application of

[135]

this Agreement, which upon determination may establish a precedent, or involves a matter appropriate for collective bargaining, the Company shall immediately notify the Union and the Union shall be entitled to be present and participate in the discussions and disposition of such grievance.

Section 7. The time periods specified in this Article may be extended or modified only by mutual consent in writing.

Section 8. In the interest of adjusting grievances at the lowest possible level, settlements of grievances shall not constitute a precedent for settlement of other grievances. A settlement arrived at in the course of the grievance procedure shall be limited to the specific occurrence out of which the grievance arose and to the particular employee or employees for whom the grievance is presented. The settlement shall be modified or voided only if the circumstances change and after discussion at the same level.

Section 9. Neither the Company nor the Union will attempt by means other than the grievance procedure (to bring about the settlement of any issue which is properly a subject for disposition through the grievance procedure. In the event of any unauthorized slowdown, boycott of overtime, or any other form of strike, and without prejudice to the right of the Company to seek any lawful remedy, the Union president (or another Union officer in his absence) shall immediately:

- Notify participating employees that the conduct is in violation of the Agreement between the Union and the Company.
- Instruct participating members to resume normal operations at once.

## ARTICLE XII
## ARBITRATION

Section 1. Only the matters specifically made subject to arbitration in Article VII, Force Adjustments and Termination Allowances, Section 4, paragraph 4;

Article VIII, Separations From the Service — Other Than Layoffs, Section 2;

Article X. Interpretation and Performance, Section 2;

Article XI, Grievance Procedure, Section 4;

Article XV, Changes in the Verizon Pension Plan and the Sickness and Accident Disability Benefit Plan, Section 3;

Article XVI, Seniority in Promotions, Section 4; and Article XXII, Verizon Services Transfer Plan and Intercompany Job Bank Program; shall be arbitrated. No demand for arbitration of any matter shall be made more than 150 days after the matter was first presented to the Company for adjustment, but if there is a relevant shorter time limitation provided in this Agreement, such shorter limit shall apply.

Section 2. The Board of Arbitration in its decision shall be bound by the provisions of this Agreement and shall not have the power to add to, subtract from, or modify any provision of this Agreement.

Section 3. The Procedure for Arbitration is set forth in Exhibit III attached to and made a part of this Agreement.

## ARTICLE XIII
## AMENDMENTS

The complete understanding between the Union and the Company has been set forth in this Agreement and the Exhibits attached hereto. Any amendment to this Agreement or any interpretation of the true intent and meaning of the provisions of this Agreement officially and mutually agreed to by the two parties concerned shall be committed to writing and signed by the duly authorized representatives of the parties.

## ARTICLE XIV
## WORK BY SUPERVISORS

Section 1. Plant Department supervisors of the grade of foreman or higher, in the Vocational forces and in the Buildings and Supplies

# EXHIBIT C

## SETTLEMENT AGREEMENT

Verizon New Jersey, Inc., Verizon Services Corp., and Verizon Avenue Inc. (collectively, "Companies") and International Brotherhood of Electrical Workers Local 827 ("IBEW" or "Union"), hereby agree as follows:

A.   The "make-whole period" for employees who were laid off as a result of the Companies' 2002 Surplus Declarations and who have been rehired or offered reinstatement ("Laid Off Employees") is the period between an employee's layoff date and the earlier of his/her return to work date or July 30, 2003. In the event that a Laid Off Employee claims that they were not aware of or notified by the Companies prior to July 30, 2003, the parties will review the facts and address on a case-by-case basis.

B.   The "make whole remedy" for Laid Off Employees shall consist of:

1.   Payment of Back Pay calculated by multiplying an employee's hourly basic wage rate based upon the hours scheduled at the time of the layoff by the number of weeks in the make-whole period (not including time on a paid disability, paid workers compensation, leave or hours approved to be absent under GRW). The basic wage rate shall include applicable progression increases. Tour differentials shall also be included but only if the Laid Off Employee was on a permanent tour that received a tour differential for at least three months preceding his/her layoff. The following shall be subtracted from back pay:

(a)    Layoff allowance payments received from his/her
Company; and,

(b)    Gross earnings from employment or self-employment for
the make-whole period, except that earnings from any
employment or self employment that existed before the
layoff shall not be subtracted; and,

(c)    Unemployment insurance benefits received for the make-
whole period which will be forwarded by the Company to
the New Jersey Department of Labor on behalf of the
employee; and,

(d)    Union dues; and,

(e)    Any contributions to the company sponsored 401(k)
savings plan or the Union Sponsored Trust that the Laid
Off Employee has elected to be applicable to this make
whole remedy, based upon the contribution percentage on
file at the time the make whole remedy is being processed
(to the extent that funds are available in the make-whole
amount); and,

(f)    Applicable garnishments allowed by law.

(g)    In the event that the sum of the items in (a) – (f) above
exceeds the amount of the backpay calculated in B.1, then
the employee must pay the balance of the layoff
allowance and union dues to the Company.  The union

dues will be forwarded to the Union by the Company as they are collected from the employee. The amount shall be paid back from each future paycheck until the amount is satisfied, but not to exceed 10% of his/her basic weekly wage. The portion of the 10% payback shall not be included in the employee's gross earnings for tax purposes. Laid Off Employees have the option of paying the money back at a rate that exceeds 10%, or in a lump sum. If any such Laid Off Employee who owes the Company money separates from service with an Enhanced Income Security Plan (EISP), the monies owed will be deducted from the EISP payment. Any monies deducted shall not be included in the gross earnings for tax purposes. If any such Laid Off Employee separates from service without an EISP, the amount owed shall be paid back at a rate no less than 50% a year.

2.   Reimbursement of COBRA premiums actually paid, or, if alternative coverage was purchased, reimbursement of premiums not to exceed COBRA amount, or, if neither COBRA nor alternative coverage was elected, out-of-pocket and unreimbursed health care expenses (medical, dental and vision) that would have been covered under the Laid Off Employee's Company health care coverage.

3.  Reimbursement of premiums paid for conversion coverage for basic life insurance, or, if alternative coverage was purchased, reimbursement of premiums for alternative coverage, up to the amount of the premium for conversion coverage.

4.  If conversion coverage elected for supplemental and dependent life insurance, reimbursement of the difference between the active employee premium and the conversion premium. If alternative coverage was elected, reimbursement of the difference between the active employee premium and the lesser of the alternative premium or conversion premium.

5.  Lost insurance proceeds payable upon the death of covered individuals that would have been paid had the Laid Off Employee not lost coverage due to being laid off. The employee must pay past premiums in order to reinstate the coverage and provide appropriate required proof of death.

6.  Credit for the value of Company-provided concession telephone service to which the employee was entitled under the parties' collective bargaining agreements or practices.

7.  Company matching contributions will be provided if the employee has elected and has funds available to make contributions to the company sponsored 401(k) savings or Union Sponsored Trust, as discussed above in Section B.1.(g). To the extent that any of the following Sourcing Analysts – Gloria J. McNair, Beatryce K. Morgan, Valerie M. Robinson, Wendy M. Daniels, Rhonda D. Juett, Susan R. Koski, Gretchen J. Salters, Michelle

A. Finkler, Grace Livingston, Olivia Williams-Cooper – did not have
sufficient make whole funds to make contributions to the company
sponsored 401(k) savings plan or the Union Sponsored Trust, the
Company will calculate what the Company matching contributions would
have been and issue a separate check that will be grossed up for tax
purposes. If any other Laid Off Employee who has not been identified
does not have sufficient make whole funds to make contributions to the
company sponsored 401(k) savings plan or the Union Sponsored Trust, the
Union can raise the circumstances with the Company and the parties will
review the facts and address on a case-by-case basis.

8.    Service credit for all purposes, including pension purposes, will be granted
for the entire period of the layoff so that no Laid Off Employee will suffer
a loss of seniority or break in seniority.

9.    Time on layoff will be counted as "hours worked" for purposes of FMLA
eligibility and for FLSA purposes (this shall be calculated based on
scheduled hours at the time of layoff, and shall not include time spent on
disability, workers comp, or other leave).

10.   If a reinstated Laid Off Employee received an annuity or cash out from the
Company's Pension Plan, his/her pension shall be governed by the parties'
February, 1998 Re-Employment After Cashout Agreement. If a reinstated
Laid Off Employee received an annuity under the company pension plan
during the layoff period, no repayment of the annuity will be requested.

11.    Laid Off Employees who elected not to be reinstated shall have their service credit for pension purposes extended through July 30, 2003 and their pensions shall be adjusted accordingly. If they received an annuity or cash out, they will be paid the additional annuity or cash out representing the difference between what they received as of the date of their layoff and what they should have received as of July 30, 2003.

12.    Laid Off Employees who are reinstated shall be allowed to reschedule and take, with pay, the vacations, excused work days and personal holidays they did not take because they were laid off, subject to local scheduling practices. Laid Off Employees who were not reinstated shall be paid for the vacation time and holidays (excluding the Personal Holiday) which they would have been entitled to had they not been laid off.

13.    Reimbursement for tuition for a completed course that would have been paid had the employee not been laid off.

14.    Upon reinstatement, all Laid Off Employees shall immediately be covered under the same life insurance coverage, including supplemental and dependent life insurance, that they had prior to their being laid off. The employee will have the option of either paying past premiums in order to reinstate the coverage without requiring evidence of good health, or re-instituting coverage without paying back premiums but having to fill out the statement of health form per the Plan.

C.    Laid Off Employees will be required to promptly provide documentation requested by the Company to substantiate elements of the make whole remedy.

No Make Whole Payments (wage or reimbursement) will be provided to associates not submitting all requested documentation on or before March 31, 2004.

D.   Regular employees who were placed into other positions to avoid being laid off will be treated as follows:

1.   Circuit Layout Assigners who accepted positions as Service Center Clerks, Facilities Technicians who accepted a position as an Alarm Response Center Technician or Material Equipment Technician, and Outside Plant Technicians who accepted a position as Driver – Medium Truck or Material Equipment Technician will be returned to their former location and job title.

2.   Such employees will be paid for any loss of basic weekly wages, including the 3% lump sum payment, that occurred as a result of accepting any of the above other titles.  This includes Circuit Layout Assigners being paid the difference between the straight time rate that they would have received as a Circuit Layout Assigner for hours over 35 and up to 40 in a week, versus the pay they received.  The time period covered by any such payment shall cover the time the employee began working in the new title and/or location, until the Sunday the employee returns to his/her former title and location.  In addition, to the extent that the distance between the new location and the employee's home was greater than the distance between the old location and the employee's home, such employee shall be reimbursed for the excess travel time and excess mileage, for the above-specified time period.

E.   The Companies will return on paper all National Operations Facilities

Technicians and Outside Plant Technicians who were voluntarily or involuntarily

transferred as a result of the fourth quarter 2002 layoffs to the work location

and/or line of business from which they were transferred; provided, the location

from which they were transferred still exists and the line of business for whom

they worked still has a presence at that location.  If the location from which they

were transferred does not exist or the line of business for whom they worked no

longer has a presence at that location, the employee will be transferred on paper to

the location where the work they were performing is being performed.  They will

remain on loan until the force rebalancing associated with the October 2003 EISP

offer is complete.  Once the force rebalancing associated with the October 2003

EISP offer is complete, the National Operations Facilities Technicians and

Outside Plant Technicians who were voluntarily or involuntarily transferred as a

result of the fourth quarter 2002 layoffs will be returned to the original work

location and/or line of business from which they were transferred, or to the

location where the work they were performing is being performed, provided that

they weren't otherwise placed through the force rebalancing process.

F.   Enterprise Solutions Group (ESG) Facilities Technicians who were transferred to

National Operations following the December 2002 layoffs will be returned to

ESG and their former work location (if their work location changed).

G.   Repair Service Clerks (Shanrika Jackson, Judy Visconti, Edward Metz, Vincent

Gowers, Clarice Butler, Cheryl Quinones, and Glynis Forbes) who were placed

into positions vacated by the December 2002 layoff of Repair Service Clerks with

more than one and less than two years of service will be returned to their previous location and work group.

H.     The Union agrees to promptly withdraw with prejudice the external event arbitration and any and all claims or challenges directly or indirectly related to the 2002 Surplus Declarations, and/or resulting layoffs, and/or their effect or implementation, including all grievances and arbitrations listed in Attachment 1, except the Union will pursue a claim for any employee who incurred excess time and/or mileage as a result of a transfer related to the 2002 layoffs. The Union further agrees not to file any new claims or challenges related to the 2002 Surplus Declarations, and/or resulting layoffs, and/or their effect or implementation.

I.     Nothing shall preclude the Union or any employee from contesting any aspect of the Companies' reinstatement and/or administration of this settlement agreement as they relate to any employee's specific circumstances. The exclusive forum for resolution of any such claim(s) shall be contractual grievance and arbitration procedures.

J.     This agreement shall be without prejudice or precedent with respect to any other agreement, case or claim, or settlement.

For the Companies                       For the IBEW

**Original Signed by**                  **Original Signed by**

**William C. Hart**                     **Dave Kubert**


Dated: December _8_ ,2003

ATTACHMENT 1

18 300 00748 03 – Misapplication of the contractual layoff language

18 300 00752 03 – Violation of Article X – Training/Retraining and Articles II, IV, V and VII

18 300 00754 03 – Refusal to pay laid off employees their vacation pay, EP days, personal time and pay for 12/20 and 21 if scheduled

1-03-004 – Company loaning Facilities Technicians before and after the layoff into the Wholesale Department in the Eastern Shore Area

1-03-019 – Layoff of four Network Technicians at 175 Park Avenue, Madison

1-03-020 – Company not backfilling all jobs designated as openings, with laid off members

1-03-021 – Company laying off Outside Plant Technicians by statewide seniority

1-03-022 – Company improperly laying off Facilities and Outside Plant Technicians in the Northern Unit

1-03-034 – Company sending Facilities Technicians from the Central area to work in the Southern area after laying off in the Southern area

1-03-035 – Company bringing in CWA members to do IBEW work in the Atlantic City area

1-03-036 – Company improperly laying off Facilities and Outside Plant Technicians in the Southern Unit

1-03-038 – Essex Unit

1-03-039 – Essex Unit

1-03-040 – Company not offering laid off Sourcing Analysts jobs that became open due to the layoff in the Drafter title

1-03-041 - Company not offering laid off Sourcing Analysts jobs that became open due to the layoff in the Repair Service Clerk title

ATTACHMENT 1

1-03-042 – Company not offering EISP to the surplus Repair Service Clerks and Drafters with more than one year of service who were subsequently laid off

1-03-043, 1-03-045 - Company improperly laying off Facilities and Outside Plant Technicians in the Essex Area

1-03-044 – Supervisors performing the work of the laid off Sourcing Analysts in the Essex Area

1-03-074 – Company violating rehire rights of laid off employees by posting openings in the RAMP system

1-03-075 – Company laid off Term Frame Attendants and a Verizon Avenue System Technician and did not backfill these positions with laid off Facilities and Outside Plant Technicians

1-03-076 – Company excluded Building Equipment Mechanics with less than one year of service from the layoff

1-03-077 – Company having Facilities and Outside Plant Technicians working out of their layoff area on a daily basis

1-03-078 – Company should have filled all shifted jobs and all contracted jobs prior to layoff

1-03-079 – Dispute regarding one year medical benefit entitlement following layoff

1-03-080 – Systems Technicians performing the work of Facilities Technicians in Hudson

1-03-081 – Hudson Unit

1-03-082 – Members on recall being denied the Systems Technicians title in Verizon Avenue

1-03-084 – Denial of EISP to the Systems Technicians – OCS

1-03-085 – Assignment of Outside Plant Technicians from the Northern Area map into the Hudson Area map

ATTACHMENT 1

1-03-086 – Assignment of Facilities Technicians in the Wholesale LOB to all area maps

1-03-087 – Dispute over the layoff date and effect on Company position for benefit entitlement

1-03-088 – Improper retention of Mr. John N. Kiarie, a Systems Technician in Verizon Avenue

1-03-089 – Working supervision by engineers in the Teaneck FMC while denying jobs to members on recall

1-03-090 – Company's layoff of the Outside Plant Technicians

1-03-101 – Employees forced to take EISP from wrongful threat of layoff because no external event justified the threat

1-03-118 – Company improperly laying off Circuit Layout Assigners in the Essex Area

1-03-119 – Company not offering laid off Sourcing Analysts jobs that became open due to the layoff in the Service Center Clerks' title in the Essex Area

1-03-120 – Company not offering laid off Circuit Layout Assigners jobs that became open due to the layoff in the Drafter and Repair Service Clerks' title in the Essex Area

1-03-141 – Improper layoff of two Facilities Technicians in the Wholesale LOB

1-03-178 – Northern Unit

1-03-179 – Northern Unit

1-03-180 – Northern Unit